IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

GORDON D. SOTO,  )
 )
    Plaintiff,  )
 )    No. 13 C 0072
v.  )
 )    Magistrate Judge Sidney I. Schenkier
CAROLYN W. COLVIN, Acting  )
Commissioner of Social Security,[1]  )
 )
    Defendant.  )

## MEMORANDUM OPINION AND ORDER[2]

Plaintiff Gordon D. Soto seeks reversal and remand of the final determination by the Commissioner of Social Security ("Commissioner"), denying his application for Supplemental Security Income ("SSI") and Medicare Qualified Government Employee benefits ("MQGE") (doc. # 23).[3] The Commissioner has responded, seeking affirmance of the decision denying benefits (doc. # 27). For the following reasons, the Court grants Mr. Soto's motion and denies the Commissioner's motion.

I.

On May 18, 2010, Mr. Soto applied for MQGE and SSI, alleging a disability onset date of December 10, 2008 (R. 165-68, 171, 185). His last-insured date was December 31, 2008 (R.

---

[1]Pursuant to Federal Rule of Civil Procedure 25(d), we have substituted Acting Commissioner of Social Security, Carolyn W. Colvin, as the named defendant.

[2]On February 28, 2013 by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to this Court for all proceedings, including entry of final judgment (docs. ## 7, 8).

[3]Mr. Soto's claim for Disability Insurance Benefits ("DIB") was made for the purpose of establishing eligibility for Medicare coverage as a Medicare Qualified Government Employee. See 20 C.F.R. § 404.1018(b).

185).[4] Mr. Soto was thus obligated to show that he was disabled between December 10 and December 31, 2008 in order to qualify for MQGE. See 20 C.F.R. §§ 404.130, 404.131, 404.315(a)(1), 404.320(b). To qualify for SSI, Mr. Soto must show that he was both disabled and financially eligible at any time after the filing of his May 18, 2010 application and prior to the March 20, 2012 Administrative Law Judge ("ALJ") decision. See 20 C.F.R. §§ 416.200, 416.202, 416.203, 416.305, 416.335.

At the administrative level, Mr. Soto claimed an inability to work due to "injuries after a fall of 15 feet off of a ladder" while working at a construction site, specifically because of arm and shoulder pain and weakness, as well as increased stress and depression beginning in May 2010, worsening hand inflammation and arthritis, digestive problems, and gum disease (R. 189, 196, 202, 217). Mr. Soto's claims were denied initially, and upon reconsideration (R. 89-93, 95-97). He requested a hearing before an ALJ, which was held on November 11, 2011 (R. 102-104, 41-79). In a written opinion issued on March 20, 2012, the ALJ concluded that Mr. Soto was not disabled through the date of the opinion (R. 20-30). The Appeals Council denied Mr. Soto's request for review of the ALJ's decision (R. 1-6), making the ALJ's decision the final decision of the Commissioner. See 20 C.F.R. § 404.981; Shauger v. Astrue, 675 F.3d 690, 695 (7th Cir. 2012).

## II.

We begin with a summary of the administrative record. We review Mr. Soto's general background and medical record in Part A; the hearing testimony and post-hearing medical consultation in Part B; and the ALJ's written opinion in Part C.

---

[4] Mr. Soto incorrectly stated the date of his last-insured status as December 31, 2013 (doc. # 23: Plaintiff's Memorandum in Support of Reversing the Decision of the Commissioner ("Pl. Mem.") at 3).

2

## A.

Mr. Soto was born on August 30, 1951, and was 60 years old at the time of the hearing (R. 48, 80, 185). Mr. Soto is a college graduate with a degree in music education (R. 49, 189); he worked as an elementary school music teacher from 1996 through 2006 (R. 190). Mr. Soto's most recent work experience was self-employment in drywall construction from 2006 until December 10, 2008, when he fell from a ladder while working (R. 46, 59, 190). Mr. Soto asserts that as a result of the fall he became unable to work, but he did not seek medical attention for his injuries until later, stating that he could not afford the medical expenses because he was uninsured (R. 59, 207). Mr. Soto explained that he is "broke" and has "tried to file bankruptcy" (R. 205). He also wrote that he could not "afford to go to a doctor because [he had] no medical insurance" and was afraid the financial strain would cause more stress (R. 207). Mr. Soto instead has tried alternative treatments, such as massage and paraffin wax therapy, which have provided little relief (R. 65, 66).

Because Mr. Soto rarely sought medical treatment, the bulk of his medical record consists of documents from doctors who examined him or reviewed his medical records in connection with his social security applications. On May 24, 2010, shortly after Mr. Soto filed his disability applications, state agency consulting physician Norma Villanueva, M.D. examined him (R. 275-77). Dr. Villanueva determined that Mr. Soto could not lift more than ten pounds at a time and that he had a 20 percent reduced capacity to push and pull and to perform gross manipulation (*Id.*). Dr. Villanueva reported tenderness and a reduced range of motion in Mr. Soto's right shoulder (R. 276). She also observed that he had a normal gait with full capacity to walk and full grip strength in both hands (*Id.*). She diagnosed Mr. Soto with "possible posttraumatic arthritis"

3

in the right shoulder, and noted that he "didn't go to see a doctor or go to any hospital due to not having insurance" (R. 277).

On July 14, 2010, Mr. Soto met with Corpia Smith, M.D., to establish primary care and have a full physical examination (R. 343-46). Dr. Smith noted that Mr. Soto "ha[d] not seen a physician since 2004 and currently uses alternative herbs for illnesses as well as acupuncture if he endures any pain" (R. 343). Dr. Smith observed that Mr. Soto had "reflexes 2+" and "muscle strength 5+ throughout upper and lower extremities," with "[n]o swelling or tenderness appreciated in upper or lower extremity joints [bilaterally]" (R. 344). Dr. Smith reported that ten years earlier Mr. Soto's brother had killed his wife and children and then committed suicide, and as a result of that tragedy Mr. Soto suffered guilt and depression (R. 343). During the examination, Mr. Soto expressed "concerning thoughts about suicidal ideation," leading Dr. Smith to recommend that Mr. Soto follow up with a social worker, which he did on that same day (R. 345-47). The social worker with whom he met, Diane Ativie, reported that Mr. Soto had no current suicidal or homicidal intent ("SI/HI") and had no history of psychiatric treatment for SI/HI (R. 347). Ms. Ativie concluded that she would offer Mr. Soto support as needed (*Id.*).

On July 15, 2010, state agency medical consultant Ernst Bone, M.D., reviewed Dr. Villanueva's May 2010 report and completed a physical residual functional capacity ("RFC") assessment for Mr. Soto (R. 282-89). Dr. Bone found that Mr. Soto could lift, carry, push or pull up to twenty pounds occasionally and up to ten pounds frequently; stand or walk for about six hours in a normal eight-hour work day; sit about six hours in a normal eight-hour work day; and occasionally climb ladders and scaffolds (R. 283-86). In addition, Mr. Soto had a limited ability to push or pull or reach in all directions with his upper extremities, and should avoid exposure to certain hazards, such as certain machinery and heights (*Id.*). Dr. Bone assessed Mr. Soto's

4

fingering ability as unlimited in both hands (R. 285). On October 19, 2010, state agency medical consultant James Madison, M.D., affirmed Dr. Bone's RFC assessment (R. 327-32).

On September 27, 2010, state agency consulting physician Roopa K. Karri, M.D., examined Mr. Soto (R. 294-97). Dr. Karri noted that Mr. Soto had borderline high blood pressure, a reduced range of motion in both shoulders, a history of arthritis in his hands with decreased grip strength of 3/5, and was obese (R. 295-97). Dr. Karri observed Mr. Soto was "able to get on and off the exam table" and "could walk 50 feet without support" (R. 296). He had "moderate difficulty squeezing the blood pressure pump," "mild difficulty with buttoning, zipping, and tying shoelaces," and could "make fists and oppose fingers" (*Id.*). She also reported that he had "tenderness in [his] fingers with small nodules" (*Id.*).

On January 4, 2011, Mr. Soto visited rheumatologist Amir Patel, M.D., to evaluate joint pain and swelling his hands (R. 341-43). Dr. Patel noted that Mr. Soto's prior arthritis had resolved in 2004 but had returned in 2010, and that although Mr. Soto did not take any over-the-counter pain relievers, he did use yoga and acupuncture for relaxation (*Id.*). That same day, x-rays were taken of Mr. Soto's hands and showed a "mild narrowing" and "mild sclerosis" of the finger joints, with "no soft tissue swelling or calcification" (R. 338). Dr. Patel diagnosed Mr. Soto with oligoarthropathy (multiple joint disease), most likely due to osteoarthritis (R. 342). Dr. Patel recommended Voltaren gel for the hand pain and advised Mr. Soto to follow up with his primary care physician (R. 343).[5]

On October 19, 2011, Mr. Soto visited Zachary Smith, D.O., complaining of urinary difficulty (R. 351-58). Dr. Smith took Mr. Soto's medical history, including the fall from the ladder (R. 351). Dr. Smith noted that Mr. Soto "had difficulty rehabilitating" from the fall, "still

---

[5] It is not clear from the record whether Mr. Soto followed up with his primary care physician. Although the ALJ wrote that "[Mr. Soto] followed up with his primary care physician a number of months later" (R. 26), the ALJ cited the previously described July 14, 2010 visit to Dr. Corpia Smith (R. 343-48).

5

thinks he has weakness today[, and] tries to do pushups daily in an effort to maintain his strength" (*Id.*). Dr. Smith diagnosed Mr. Soto with polyuria, shoulder pain (for which he ordered x-rays), and a need for a flu vaccination (R. 354). Mr. Soto was to return to Dr. Smith in six months (*Id.*). The x-rays of Mr. Soto's shoulders taken on October 21, 2011 showed "minimal degenerative changes . . . at the acromioclavicular joint" (R. 349, 350).

## B.

At the hearing before the ALJ on November 1, 2011, Mr. Soto, who was represented by counsel, and a vocational expert ("VE") testified (R. 43, 44).

Mr. Soto worked as a music teacher from 1996 through the end of the 2004 or 2005 school year (R. 57). He was the "primary teacher for . . . maybe 12 or 15 [different classes]," with classes lasting "40, 50 minutes" (R. 58). He explained that most of his work day was filled with teaching students and preparing for classes and concerts (*Id.*). He would constantly be using his hands to play piano all day, and would "have to put [his] hands in ice and everything" when he got home, though with no relief (*Id.*). Mr. Soto was laid off at the end of the 2004 or 2005 school year, did not receive a full pension, and lost a good portion of his pension through "the AIG-VALIC scandal" (R. 59). He was "basically left with nothing" (*Id.*). Mr. Soto was later self-employed in drywall construction until his accident (R. 53-55). He described this work as not "fulltime or anything, just odd jobs . . . when [he] could get a job" (R. 53). His work involved lifting drywall weighing approximately 80 pounds, though his cousin helped (*Id.*).

Mr. Soto's accident occurred in December 2008 (R. 59). He fell from a ladder onto a composite sink (R. 59, 60). He stated that the right side of the sink was "chopped off" from his fall, and the "left side of the sink chopped off [his] ribs" (R. 60). Mr. Soto did not have medical insurance, and had to be picked up by his mother and sister after taking the train back home from

6

the job (R. 59). He stayed with his mother and received care from her for the next six months until he was able to "move [his] arms a little bit" (R. 60). Mr. Soto finally sought medical attention through the North Shore low income program at Evanston Hospital in 2010 (*Id.*).

Mr. Soto suffers pain and swelling in his hands that requires massaging throughout the day and experiences no relief from the Voltaren gel, even though he uses it almost every night (R. 61-63). His symptoms become worse when he "uses [his hands] a lot" or "squeeze[s] stuff a lot," and he can only continuously use his hands for 10 to 12 minutes before having to rest them for "a couple of hours" (R. 63, 64).

Mr. Soto does not own a car but does have a driver's license and uses an I-GO Car when he needs to travel distances greater than he can walk (such as when he goes to visit his mother) (R. 50, 51). He walks to the grocery store and to his doctors' offices since they are only a few blocks from his home, and he even walked to the hearing since it was not far from his home (*Id.*). He performs some light tasks for his elderly mother when he goes to visit her (R. 52).

A VE also testified (R. 72-77). The ALJ asked the VE to describe the work available to an individual of Mr. Soto's age, education, and work experience who could work at a light exertional level, limited to no ladders, ropes, scaffolds, occasional reaching with the dominant right upper extremity, and needed to avoid concentrated exposure to certain hazards (R. 74). The VE opined that if such a person could frequently finger bilaterally and occasionally reach overhead bilaterally, that person could perform a past position as a music teacher (*Id.*). The VE stated that if such a person were limited to occasional fingering bilaterally, however, music teaching would not be available (R. 75). The VE opined that alternative positions as a teaching assistant, gate guard, or retail salesperson would be available to someone with these limitations, but the VE further cautioned that if someone had to be off work at least three days a month due

7

to symptoms from his impairment or side effects of medication, no jobs would be available (*Id.*). The VE also observed that no positions would be available if a person had to rest his hands for an hour or two after using them for 10 to 15 minutes (R. 76).

Following the VE's testimony, the ALJ concluded that the availability of jobs depended on the frequency of fingering that Mr. Soto could sustain (R. 77). The ALJ acknowledged that there was a conflict between the mild degenerative changes shown in the January 2011 x-rays of Mr. Soto's hands and Dr. Karri's assessment of 3/5 grip strength limitation in September 2010 and decided that she needed an expert opinion to help her quantify Mr. Soto's fingering limitations:

> I mean I don't really find [frequency of the fingering] supported to occasional fingering in the record. Basically we're talking minimal, degenerative changes scattered, mild degenerative changes from the x-rays. What I think I'm going to do is send this out for an orthopedic interrogatory with a medical source statement to tell me, or have an expert tell me what the limitations are because I do see the 3/5 grip strength in the CE so I'm not an expert. I can't quantify that, but to kind of reconcile those dichotomies for me . . . -- there's some contradictions to me in your medical records. I'd like to have those resolved by an expert. Not contradiction. That was too strong a word. But the x-ray is going to show that you have only minimal degenerative changes in your hands . . . Yet when they have you perform the exercises, there seems to be some apparently serious limitations. So I'm going to send this out to an expert . . . – have them, an orthopedic expert, and have them review the record and send me back their opinion.

(R. 77, 78).

The ALJ sent out a medical interrogatory to orthopedic surgeon Richard A. Hutson, M.D., asking him to "specify [Mr. Soto's] impairments, if any, established by the l evidence" (R. 368). Dr. Hutson reviewed Mr. Soto's medical records and completed the interrogatory on November 11, 2011 (R. 368-71). Dr. Hutson noted a slight decrease in the range of motion of Mr. Soto's right shoulder with no other orthopedic complaints, and concluded that Mr. Soto's

8

impairments were "non-severe" and "not totally disabling" (R. 368). Dr. Hutson later reaffirmed his opinion after receiving the October 2011 x-rays of Mr. Soto's shoulders (R. 372).[6]

## C.

On March 20, 2012, the ALJ issued a written decision finding Mr. Soto not disabled and denying him benefits (R. 17-34). In evaluating Mr. Soto's claim, the ALJ applied the five-step sequential evaluation process for determining disability. 20 C.F.R. §§ 404.1520(a)(4); 416.920(a). The process requires the ALJ to consider whether: (1) the claimant has engaged in any "substantial gainful activity" since the alleged disability onset date; (2) his impairment or combination of impairments is severe; (3) his impairments meet or medically equal any impairment listed in Appendix 1 of the regulations; (4) his residual functional capacity ("RFC") prevents him from performing past relevant work; and (5) his RFC prevents him from performing any other work existing in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(a)(4), (b)-(f); 416.920(a). The claimant bears the burden of proof at Steps 1 through 4, after which the burden shifts to the Commissioner at Step 5. *Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011).

At Step 1, the ALJ determined that Mr. Soto had not engaged in substantial gainful activity since his alleged disability onset date of December 10, 2008 (R. 22). At Step 2, the ALJ found that Mr. Soto's severe impairments were obesity, a history of arthritis in both hands, hypertension, and post-traumatic arthritis in the right shoulder (*Id.*). The ALJ found that Mr. Soto's alleged depression, anxiety, digestive problems, gum disease, ankle pain, and headaches were not supported by evidence in the record to the extent needed to establish a medically determinable impairment (R. 23). The ALJ observed that in 2010, Dr. Smith had noted Mr. Soto's "depress[ion] and stress[] about his medical condition and family issues, including past

---

[6]Dr. Hutson did not address Mr. Soto's fingering limitations.

9

traumatic experiences . . ., possible suicidal thoughts, feelings of guilt, and occasional tearfulness" (*Id.*). However, the ALJ also observed that Mr. Soto later "denied suicidal or homicidal ideations, and denied needing further services" when he met with a social worker (*Id.*).

At Step 3, the ALJ determined that Mr. Soto's impairments did not meet or medically equal a listed impairment (R. 23). The ALJ determined that

> [Mr. Soto's] arthritis . . . is not characterized by a gross anatomical deformity and chronic joint pain and stiffness. There are no signs of limitation of motion, or other abnormal motion, and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis resulting in the inability to perform fine or gross movements effectively . . .

(R. 23, 24). Therefore, the ALJ concluded Mr. Soto's arthritis did not meet or medically equal a listed section (*Id.*). The ALJ next concluded that Mr. Soto's hypertension did not meet or medically equal a listed impairment because "it ha[d] not caused any end-organ damage, and there were no signs that it affected his cardiovascular, neurological, renal, or other body systems severely enough to meet the listed criteria" (R. 24). Lastly, the ALJ concluded "[Mr. Soto's] obesity does not meet or medically equal a listed impairment because he does not have another impairment that independently meets or medically equals a listed impairment" (*Id.*).

The ALJ then determined that Mr. Soto had the RFC "to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) except [that he] is never able to climb ladders, ropes, or scaffolds, and he is only able to do occasional overhead reaching bilaterally and only occasional reaching with his dominant right upper extremity . . . [and] [h]e must avoid concentrated exposure to hazards, and he can do frequent fingering bilaterally" (R. 24).

In support of this RFC, the ALJ analyzed Mr. Soto's daily activities, his claimed limitations, his medical record, and treatment history, along with the medical opinions in the record. The ALJ found that Mr. Soto originally complained of only functional limitations due to

10

his injuries, but later also complained of depression, increased stress due to family issues, worsening hand inflammation, digestive problems, and gum disease (R. 24). The ALJ noted that Mr. Soto's stated that he exercised constantly, walked, climbed stairs, and ate a special diet in order to keep his strength up (R. 24, 28). Mr. Soto complained of shoulder, hand, and arm weakness and soreness that made it difficult for him to perform daily activities, but stated he was "able to live alone, drive when necessary, shop for food and other necessities, do light meal preparation and housework, and spend time with friends and family" (*Id.*). She also observed that Mr. Soto testified his injuries were due to his fall and that they prevented him from returning to his prior work as a construction worker or music teacher (R. 25). She mentioned that Mr. Soto had testified that he did not seek treatment initially because of a lack of medical insurance and financial resources (*Id.*). Although he began treatment in 2010 under the North Shore low income program, the ALJ remarked that Mr. Soto still complained of "pain, swelling, bleeding, and discomfort in his hands, and [the prescribed Voltaren gel] only gives him some relief" and that "he wears a weight belt to support his back, and wrist supports" (*Id.*). The ALJ also noted that Mr. Soto naps often during the day, and has "knots in his fingers, tremors in his hands, and inflammation causing pain" (*Id.*).

In assessing Mr. Soto's credibility, the ALJ considered Mr. Soto's treatment history, the objective medical evidence, and Mr. Soto's daily activities. The ALJ found that Mr. Soto's injuries were not as severe or limiting as he alleged because he primarily relied upon conservative treatment (using only massage therapy and alternative treatments) and because he waited nearly two years after his injury and alleged onset date to seek any medical treatment (R. 27). In addition, the ALJ observed that the "relatively benign clinical signs and diagnostic tests" as well as Mr. Soto's denials of pain or other symptoms undermined the credibility of his

11

subjective complaints that he is unable to perform work at any exertional level" (*Id.*). The ALJ also found Mr. Soto's claims "less credible" because of his ability to carry out certain daily activities, including living alone, driving, shopping for food, doing light meal preparation and housework, spending time with friends and family, and exercising regularly (R. 28).

In reviewing the medical opinion evidence, the ALJ gave "moderate weight" to consultative examiner Dr. Villanueva's opinion from May 2010 because Dr. Villanueva was able to physically examine Mr. Soto, but was unable to review all of the records presented at the hearing level and only examined him once (R. 28). Likewise, the ALJ did not give great weight to state agency physician Dr. Bone's opinion from July 2010, since he was unable to review records submitted at the hearing level and because Dr. Bone's opinion did "not adequately consider more recent evidence suggesting more restrictive manipulative limitations" (*Id.*). Finally, the ALJ stated that she could not give "much weight" to the opinion that she had requested from medical expert and orthopedic surgeon Dr. Hutson (*Id.*). The ALJ discussed the grip tests Dr. Karri had performed that showed weakness in Mr. Soto's hands; however, the ALJ did not state what weight, if any, she placed on that evidence. The ALJ concluded that "the record contains somewhat contradictory medical evidence including diagnostic test results, clinical findings, and diagnoses from physicians" and the ALJ also found that Dr. Hutson's opinion was "cursory" and "failed to consider the more recent evidence on second review thoroughly" (*Id.*).

At Step 4, the ALJ relied on the testimony of the VE and determined that Mr. Soto was capable of performing past work as a music teacher, as actually and generally performed at the light, skilled level (R. 29). The ALJ therefore concluded that Mr. Soto was not disabled (*Id.*).

### III.

We review the ALJ's decision deferentially, and will affirm if it is supported by substantial evidence. *Thomas v. Colvin*, 745 F.3d 802, 806 (7th Cir. 2014). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal citations and quotations omitted). To support a decision with substantial evidence, the ALJ must build an "accurate and logical bridge" between the relevant evidence and his conclusion. *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013).

Mr. Soto argues for reversal and remand, asserting that the ALJ erred by failing to (1) adequately develop the record; (2) properly assess his credibility by, among other things, placing undue reliance on Mr. Soto's activities of daily living; and (3) analyze the specific requirements of Mr. Soto's past relevant work. For the reasons stated below, we agree that the ALJ failed to adequately develop the record, and grant Mr. Soto's motion on that ground.

### A.

Mr. Soto argues that the ALJ failed to adequately develop the record when she rejected a medical opinion that she had specifically requested without seeking a clarified or additional opinion to resolve the disparity in the evidence that she had identified (Pl.'s Mem. at 13-16; doc. # 33: Plaintiff's Reply to Defendant's Memorandum in Support of the Commissioner's Decision ("Reply") at 3-4). The Commissioner did not respond to this argument (doc. # 28: Defendant's Memorandum in Support of Motion for Summary Judgment and Response to Plaintiff's Motion for Summary Judgment ("Def. Mem.")). While the Commissioner did not assist her cause by ignoring this argument, we do not treat the Commissioner's silence as a concession. Rather, when considering its merits, we find that plaintiff's argument carries the day.

13

When an ALJ determines that she does not have sufficient medical evidence to make a disability determination, she may request an additional consultative examination. 20 C.F.R. §§ 404.1517; 416.917. If, however, an ALJ subsequently rejects an examination that she had requested, she must either seek out additional information or explain why the additional opinion is no longer necessary to her decision. *See Barnett v. Barnhart*, 381 F.3d 664, 669 (7th Cir. 2004) ("an ALJ has a duty to solicit additional information to flesh out an opinion for which the medical support is not readily discernible"); *Clayborne v. Astrue*, No. 06 C 6380, 2007 WL 6123191, at *6 (N.D. Ill. Nov. 9, 2007) (where a consultative examination was deemed necessary, the ALJ's finding that the exam's results were inconclusive does not release the ALJ from his obligation to develop the record). "Failure to fulfill [the duty to develop a full and fair record] is good cause to remand for gathering of additional evidence." *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000) (citations omitted) (internal quotation marks omitted).

After Mr. Soto testified about pain and difficulty using his hands (R. 61-64), a VE testified about the impact of limited fingering ability on the availability of potential work (R. 72-76). The ALJ determined that the decision would hinge on the fingering issue (R. 77). Recognizing "dichotomies" in the medical record between x-rays showing "only minimal degenerative" changes in his hands and Dr. Karri's examination showing decreased grip strength, the ALJ sent Mr. Soto's records to orthopedic surgeon and medical expert Richard Hutson, M.D., for a post-hearing medical review (R. 77). The ALJ sought Dr. Hutson's opinion to clarify the level of fingering Mr. Soto could perform.

Dr. Hutson reviewed Mr. Soto's records on November 11, 2011 and again on December 1, 2011, when he received additional medical records with the October 2011 x-rays of Mr. Soto's shoulders (R. 368-72). The ALJ did not send Mr. Soto for a physical examination, but instead

14

sent Dr. Hutson a medical interrogatory to guide his review of Mr. Soto's records. The interrogatory, however, did not direct Dr. Hutson's attention to the disparity in the medical record that the ALJ sought to resolve, but only generally asked Dr. Hutson to "specify [Mr. Soto's] impairments, if any, established by the evidence" (R. 374). Specifically, the ALJ did not ask Dr. Hutson to address the extent of Mr. Soto's limitations on fingering.[7]

In the ALJ's analysis of Mr. Soto's RFC, she reviewed Dr. Hutson's opinion, but decided she could not "give it much weight" (R. 28). The ALJ did so while acknowledging that "[t]he record contain[ed] somewhat contradictory medical evidence including diagnostic test results, clinical findings, and diagnoses from physicians" (*Id.*). She deemed Dr. Hutson's opinion "cursory" and opined that Dr. Hutson had "failed to consider the more recent evidence on second review thoroughly" (*Id.*). Consequently, the ALJ never resolved the question for which she had sought Dr. Hutson's opinion.

We do not fault the ALJ for finding Dr. Hutson's response unhelpful. However, once the ALJ determined that she needed expert assistance, she could not simply reject the opinion she sought out without either seeking an additional opinion or explaining why she no longer needed one. The ALJ's failure to do either requires remand. In *Clayborne*, the court concluded that an ALJ who found a claimant's consultative examination inconclusive was obligated to further develop the record. *See Clayborne*, 2007 WL 6123191, at *6; *see also Collins v. Colvin*, No. 12 C 1880, 2013 WL 1284235, at *11-12 (N.D. Ill. March 27, 2013) (remand required when an ALJ requested a post-hearing consultative examination to resolve a void in the record but then rejected the medical opinion without reconciling the gap in the record). Although the ALJ

---

[7]Given the paucity of evidence from Mr. Soto's medical records due to his very infrequent treatment, and the importance of resolving the discrepancy in the medical record, on remand the ALJ may wish to consider sending Mr. Soto for a physical examination (instead of relying on a record review) to determine the limitation on his frequency of fingering.

15

rejected the opinion that she had previously deemed necessary, her opinion provided no insight into how she had resolved the question of Mr. Soto's fingering limitations. In addition, although she listed some doctors' opinions and assigned weights to their opinions, she never assigned a weight to Dr. Karri's opinion detailing potential weakness in Mr. Soto's hands and never adequately explained how the evidence supported her conclusion that Mr. Soto could do "frequent" fingering bilaterally. Consequently, we find that the ALJ failed to draw an accurate and logical bridge between the evidence and her conclusion.

We agree with the ALJ that the ruling in this case may turn on the limitation on Mr. Soto's frequency of fingering. If Mr. Soto is able to frequently finger bilaterally, he would be able to perform past relevant work as a music teacher according to the VE testimony (R. 74, 75). On the other hand, if he is unable to perform his past relevant work, Mr. Soto's age would make him disabled unless he has transferable skills that would dictate a different result. *See* 20 C.F.R. §§ 404.1568(d)(4), 416.968(d)(4) ("If you are *closely approaching retirement age* (age 60 or older) and you have a severe impairment(s) that limits you to no more than *light* work, we will find that you have skills that are transferable to skilled or semiskilled work only if the light work is so similar to your previous work that you would need to make very little, if any, vocational adjustments in terms of tools, work processes, work settings, or industry"). In addition, if Mr. Soto must rest his hands for an hour or two after 10 to 15 minutes of use, the VE testified that no work would be available for him (R. 75). The ALJ properly identified the importance of Mr. Soto's fingering limitations to the outcome of his disability claim and sought an additional medical opinion on that question, but she failed to pursue further information once she found Dr. Hutson's opinion unhelpful. Once the ALJ rejected Dr. Hutson's opinion, she needed to explain

16

why she no longer found it necessary or to seek further medical consultation to resolve the question.

We therefore reverse the ALJ's decision and remand for proceedings consistent with this opinion. Because we grant Mr. Soto's motion on this ground, we need not address the remaining challenges that Mr. Soto raises. On remand, however, when ascertaining Mr. Soto's fingering limitations, the ALJ may also wish to analyze the specific fingering requirements of Mr. Soto's past work as a music teacher in order to determine if he can return to it.

## CONCLUSION

For the reasons set forth above, we grant Mr. Soto's motion for remand (doc. # 23), and we deny the Commissioner's motion to affirm (doc. # 27). We of course express no view as to the outcome the ALJ should reach. This case is terminated.

**ENTER:**

_____
**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

**DATED: June 16, 2014**